## Wheeling Gas Co. *vs.* The City of Wheeling.

### July Term, 1872.

1. Courts of equity have always had and exercised jurisdiction to interfere to set aside awards for fraud, accident, partiality, misconduct or mistake of the arbitrators. This power is even reserved to them in the statute providing for submissions on the record.

2. It is not matter sufficient to set aside an award for misconduct on the part of an arbitrator, that the arbitrator, prior to his appointment, had expressed an opinion as to the merits of the controversy, provided the party selecting him was not aware of such expression of opinion.

3. Arbitrators are called upon to execute a joint trust and ought to look impartially at the true merits of the matter submitted to their judgment, without reference to the manner in which the charge has been placed upon them. In no case can they become an advocate, nor act as agent, for the party appointing them.

4. A charge in a bill that one of the arbitrators acted as the "adviser and partisan" of the party appointing or selecting him, is a sufficient charge of partiality and misconduct, to give a court of equity jurisdiction of a case asking to set aside an award.

5. It is not alone the fact, but the aspect of perfect fairness, which must be preserved, and an arbitrator cannot be too careful as to his conduct, holding this end in view. It is not a conscientious intent to be honest, on the part of the arbitrator, nor his conviction that he is so, that can suffice. It is his external actions that will be subjected to scrutiny, and if these do not satisfactorily bear the test the award will fall.

6. There may be ample misconduct, in a legal sense, to make the court set aside an award, even where there is no ground for imparting the slightest improper motives to the arbitrators.

7. Where an arbitrator attended mainly to the interests of the party appointing him, in collecting up and arranging testimony, procuring the attendance of witnesses and examining and cross-examining them, it is sufficient evidence of legal misconduct to set aside the award.

8. Parties who really intend to have their rights decided by impartial judges are entitled to insist that all of the arbitrators shall be impartial. But if they are content to submit questions in controversy to those who are known

to have formed and expressed opinions upon the subject matter, or who are known to have partialities and prejudices for or against the respective parties, an award made by such arbitrators is binding.

9. Under such circumstances, a gas company, who selected one of its stockholders as an arbitrator, who with the arbitrator selected by the other party chose an umpire, ought not to be heard to impeach an award. Especially as the testimony discloses that the amount of the award seems to be fair.

10. Where a submission is not made under the statute, and the award is signed by but two of the arbitrators, the court cannot determine its sufficiency or insufficiency for want of jurisdiction.

The facts in this case are, substantially, that the Wheeling Gas Company was a corporation created by act of the General Assembly of Virginia, with the privilege to construct and maintain gas works in the city of Wheeling, and such privilege was exclusive for the space of thirty years; Provided, that at the expiration of twenty years from the date of its commencement, and within six months thereafter, the city of Wheeling should have the right at the discretion of the council thereof, to purchase the grounds, works, fixtures and property of the company, at such terms as could be agreed upon between the company and the council, or at the price and on the terms to be fixed by the award of three persons to be chosen as follows: the first by the company, the second by the city, and the third by the two thus chosen. And in making up the award the arbitrators were to have regard to the then actual value in money of such grounds, works, &c., and should not take into consideration the value of the franchises of the charter, or the dividends or profits accruing to the stockholders.

The company organized under this act and began to supply gas on the first day of January, 1851.

On the 3d of January, 1871, the council notified the company of the purpose of the city authorities to buy the grounds, works, &c., at the price and upon the terms to be ascertained by an award, having previously endeavored to negotiate for the same. The company nominated Beverly M. Eoff as its arbitrator, the city nominated John McLure, and they selected Robert B. Woods. These parties proceeded to discharge the duties imposed upon them, and on the 29th of May, 1871, McLure and Woods made an award, Eoff dissenting therefrom, ascertaining the price and value of the company's property to be seventy-three thousand six hundred

and thirty-seven dollars and fifty cents, and that the city should become the purchaser upon the payment of that sum before the 30th of June following. On the 1st day of June, 1871, the city, through its officers, tendered to the company the sum mentioned in the award, which was refused, of which refusal the company gave formal notice on the 12th following.

The city through its Mayor and policemen took forcible possession of the works on the 2d of June, the day after its tender, and continued to operate them.

On the 18th of July, 1871, the company filed its bill in the circuit court of Ohio county, alleging that by reason of misconduct on the part of McLure, one of the arbitrators the award was null and void, and prayed that the city and its agents be enjoined and restrained from operating and interfering with the company's works, and be required to account for rates received, &c. The company had previously instituted an action of unlawful detainer against the city, which was pending when the injunction was granted. Answers were filed to the bill and depositions taken and the cause was finally heard on the 12th of March, 1872, when the injunction was dissolved and the bill dismissed.

The misconduct on the part of the arbitrator, McLure, was alleged to be that he had formed and expressed an opinion as to the value of the company's property before his appointment as arbitrator, and therefore was incompetent. Also that throughout the investigation of the arbitrators, he acted as the adviser and partisan of the city in the procurement of testimony and examination of witnesses; the expression of his opinion as to the value of different portions of the company's property and in his declaration of unwillingness to believe the opinions of the company's witnesses as to the value of the property, before the witnesses were sworn.

The testimony in relation to this subject, which was the only matter considered in this court, will be found in the opinion of Maxwell J.

The plaintiff appealed from the decree dismissing the bill.

*Wheat, Lamb* and *Pendleton* for the appellant.

Messrs. Lamb and Paull, for the appellants, having examined the evidence in relation to the manner in which the

arbitration was conducted, proceeded to consider the principles of law applicable to the question, as follows;

The misbehavior or partiality of an arbitrator cannot be pleaded, or given in evidence, in defence of an action at law to enforce an award. 2 *Sto. Eq.* § 1452; 1 *Wms. Saund.* 327, *a.* note 3; *Morse on Arbitration*, 595, 596; *Russell's Arbitrator*, in Vol. 63 of Law Library, 509–511, marginal paging. The appropriate remedy in such cases is in equity. "Courts of equity," says Story, "will in all such cases grant relief, and upon due proofs, set aside the award." 2 *Sto. Eq.* § 1452; *Morse on Arbitration, p.* 595, 596; *Sisk* vs. *Garey*, 27 *Md.* 401; *Shinnie* vs. *Coil*, 1 McCord's Ch. R. 478; *Cleland* vs. *Hedley*, 5 Rhode Island 163; Russ. Arb. Chap. 9, Sect. 1, p. 614, and Chap. 11, Sect. 1, p. 666. By the Statute, however, (*Code of West Va.* Ch. 108, p. 569; *Code of Va.* 1860, Ch. 153, p. 656,) if parties submit any controversy to arbitration, and agree that such submission may be entered of record in any court, the award in such case may be set aside on motion, for errors apparent on its face, or where it appears to have been procured by corruption, mistake or other undue means, or that there was partiality or misbehavior, in the arbitrators or any of them; but it is expressly declared that this provision shall not be construed to take away the power of courts of equity over awards.

Partiality or misbehavior in the arbitrators, or any of them, is therefore in equity good cause for setting aside an award; and we think both have been clearly shown in the present case. Having, however, already discussed and attempted to explain the facts, we propose here only to state the rules of the law, which, we think, ought to govern the case, supposing that their application will be sufficiently obvious.

"It is a common practice for the submission to provide that the plaintiff and defendant shall each appoint an arbitrator. The arbitrators so selected are not to consider themselves the agents or advocates of the party who appoints them. When once nominated, they are to perform the duty of deciding impartially between the parties, and they will be looked upon *as acting corruptly if they act as agents*, or take instructions from either side." *Rus. Arb.* Ch. 4, Sect. 3, p. 206–207.

In *Calcraft* vs. *Roebuck*, 1 Ves. Jr. 227, it was said by Lord Thurlow, that an arbitrator should be indifferent; for by con-

sidering himself as the agent of the person appointing him, he acts against good faith and breaks a most solemn engagement. (See also 9 *Cushing* 572.)

In *Morse on Arbitration*, page 106, it is said; "A single arbitrator, agreed upon by both disputants, is not likely to forget that he is to be an impartial judge. But where each party nominates an arbitrator, the nominee may sometimes be tempted to regard himself as specially bound to protect the interests of his appointer. The notion, however, is wholly wrong. Under no circumstances can an arbitrator become an advocate. He is always bound to exercise the highest degree of judicial impartiality, without the slightest regard to the manner in which the charge has been placed upon him."

"To act as the agent of one of the parties regarding the matter in controversy, or to receive and act on *ex parte* representations or evidence, or otherwise permit undue influence from any quarter, constitutes such partiality, as will invalidate an award." *Strong* vs. *Strong*, 9 Cushing 561, 7th head note.

In the case last cited, the Supreme Court of Massachusetts overruled four of the objections taken by the defendant to the award, but sustained the fifth one; which was, that one out of the five arbitrators was not a disinterested person, and had in making the award conducted himself with partiality to the plaintiff.[*] (See 9 *Cushing* 568, and following.) That court, then, would not have permitted the award in the present case to stand.

That the arbitrator should be impartial, belongs to the class of principles which are of so elementary a character that they are more frequently taken for granted, than expressed or discussed. But we may sometimes find it emphatically announced.

In *Morse on Arbitration*, p. 107, (see also p. 533–4,) it is said: "From all the foregoing pages of this chapter, may be gathered the rule that the fundamental requisite in the arbitrator is impartiality." In this requisite we have endeavored to show that Mr. McLure was lamentably deficient.

---

[*] "Where there are several arbitrators, misconduct on the part of any one of them will suffice to avoid the award of all," Morse on Arbitration, p. 537, top of page.

In *Rus. Arb.* p. 185, under the heading, *Duty of the arbitrator to receive no evidence unless both parties are present,* the author lays down as a rule, that "An arbitrator can hardly be too scrupulous in guarding against the possibility of being charged with not dealing equally with both parties. Neither side can be allowed to use any means of influencing his mind, which are not known to and capable of being met and resisted by the other." If the city had procured the letter from Dr. Connelly, and the "letters and bills of costs and values," it would not have been proper according to this authority, for the arbitrators to allow them to be used as the means of influencing their minds; and certainly it does not mend the matter, that the arbitrator himself gathers up *ex parte* statements, without notice to one of the parties, and hands them over to the other party to be put in evidence; and then founds his award upon them.

After citing some cases on the subject of awards, it is said by Judge Carr, delivering the opinion of the Court in *Graham's Admr's* vs. *Pence,* 6 Rand. 538, "These are some of the cases on the subject. They show that strict impartiality must be observed, and that, even where the court think the arbitrators have been free from intentional wrong,* they sometimes set aside their award, because their conduct has been such as on general principles cannot be supported." . Speaking of the particular case then under consideration, he says on the same page, "The aspect of the case which strikes me as strongest against the award, is the appearance of partiality which is exhibited."

It is uniformly held, so far as our examination of the cases go, that if arbitrators hear evidence when the party against whom it is introduced has had no notice of the taking of the same, or no opportunity for cross-examination, and does not consent to its being received, this is misconduct on the part of the arbitrators, and the court will set aside their award.

---

*"There may be ample misconduct in a legal sense to make the court set aside an award, even where there is no ground of imputing improper motives to the arbitrator." Rus. Arb. 627; Morse on Arbitration 583-4; Re Brook & Delcomyn, 11 Eng. Com. Law R. 403; 13 Grat. 539; Passmore vs. Pettit, 4 Dallas 271.

Partiality, upon which to set aside an award, need not be a corrupt partiality. Shinnie vs. Coil, 1 McCord's Ch. R. 478.

In *Shinnie* vs. *Coil*, 1 McCord's Ch. R. 478, one of the parties to the submission procured sundry affidavits, which were placed in the hands of the arbitrators the day before their last meeting. The party against whom the affidavits were read, "had no notice of the time or place of the examination of the witnesses, nor of their names, nor the subject matter upon which they were to be examined." The arbitrators met, read the affidavits, and rendered an award adverse to the party against whom the affidavits were used. The court, on bill in equity, set aside the award; deciding, according to the head-note of the case, that "An award will be set aside where the arbitrators hear evidence without giving the opposite party an opportunity of being heard and of cross-examination. Partiality, upon which to set aside an award, need not be a corrupt partiality."

Our case, we think, is stronger against the award than *Shinnie* vs. *Coil*. In the latter, the affidavits, though *ex parte*, were sworn to. The unsworn statements of third persons were received in evidence against us. The affidavits in *Shinnie* vs. *Coil* were collected up by a party to the submission and handed in to the arbitrators. The *ex parte* papers received in evidence against us, were gathered together by an arbitrator from distant parts, and handed over by him to the Attorney for our adversary, in order that he might introduce them against us, under a rule of procedure, the adoption of which that same arbitrator had procured.

In *Cleland* vs. *Headley*, 5 Rhode Island 163, the cases on the subject were extensively considered. "The result of these cases," say the court, "and many others might be added, seems to be that the award cannot be upheld where the arbitrator has received evidence from witnesses of which the party had no notice, and no opportunity to be heard in reply * * * * The policy of the law requires, in order to the due administration of justice, that the cause of no party litigant should be subject to be influenced by anything addressed to the mind of the judge, which he has no means of knowing, and has no opportunity to meet, either in argument or proof." (See 5 R. I. 170.) The decision in the case was in conformity with these principles. The award was set aside upon bill in equity.

In the case of *Re Brook and Delcomyn*, 111 Eng. Com. Law R. 403, an umpire received certain evidence, without the knowledge of one of the parties to the submission, or any opportunity being afforded to him to explain or rebut it.[*] The court of common pleas of England set aside the award. "I am convinced," says Erle C. J., "that none of the parties here concerned would intentionally do what is wrong. But if such a course were to be sustained, it would open a door to the possible perpetration of much fraud. This is not a technical objection. It is one of the first principles in the administration of justice, that the tribunal which is to decide must hear both sides, and give both an opportunity of hearing the evidence upon which the decision is to turn." See pages 415–416.

"However immaterial an arbitrator may deem a point to be," says Russell, (*Rus. Arb.* 185–6,) "he should be very careful not to examine a party or a witness upon it, except in the presence of the opponent. The smallest irregularity in this respect is often fatal."

*Dobson* vs. *Groves*, 51 Eng. Com. Law R. 637, decided by the Queen's Bench, is concisely stated in the head-note, as follows: "Where an arbitrator questions a witness and receives statements from him, in the absence and without the consent of a party to the reference, the court will set the award aside, without taking into consideration the nature of the statements or the probability of their having influenced the decision." If the inquiries of the arbitrator and the answers thereto were by letter,—if statements taken without the knowledge or consent of a party to the reference, were received as evidence against him, without being sworn to—if such statements were collected together, with extraordinary diligence, by an arbitrator from various parts of the country, and handed over to one of the parties to be used against his opponent—and if they did influence the decision, it certainly

---

[*] In this case of Re Brook and Delcomyn, the arbitrators did not agree, and an umpire was appointed. Bevan, one of the arbitrators, brought before the umpire evidence which had not been communicated to the other arbitrator, and which Delcomyn, one of the parties to the submission, had no opportunity of meeting by contradictory evidence. The decision was founded on that fact alone.

would not weaken the case of the party who seeks to set aside the award.

The case of *Re Plews and Middleton* in the same volume, page 845, is in substance to the same effect. The arbitrators had agreed upon their award except a single item. In order to complete it, it was necessary to ascertain the amount of interest due by one of the parties to the reference to Miss R. The arbitrators by an understanding among themselves, questioned Miss R. on the subject separately, in the absence and without notice to the parties, and upon her statement to each of them being found to agree, made up their award accordingly. The court of Queen's bench, for this cause, set aside the award. "To uphold this award," said Coleridge J., "would be to authorize a proceeding contrary to the first principles of justice. The arbitrators here carried on examinations apart from each other and from the parties to the reference; whereas it ought to have been conducted by the arbitrators and umpire jointly, in presence of the parties."*

These cases overrule *Atkinson* vs. *Abraham*, 1 Bos. & Pul. 175, and *Bignall* vs. *Gale*, 2 Man. & Gr. 850, (See 51 Eng. Com. Law R. 647-8 and 851 ; Rus. Arb. 186, 187.)

In *Harvey* vs. *Shelton*, 7 Beavan 455, an award was set aside by Lord Langdale, Master of the Rolls, on the ground of interviews having taken place between the arbitrator and one of the parties to the reference in the absence of the other, in which an item in dispute had been discussed and explained; and it was also decided that misconduct on one side cannot be set-off against similar misconduct on the other, in order to sustain an award. "It is," said his Lordship," p. 462, "so ordinary a principle in the administration of justice, that no party to a cause can be allowed to use any means whatever to influence the mind of a judge, which means are not known to and capable of being met and resisted by the other party, that it is impossible for a moment not to see that this was an extremely indiscreet mode of proceeding, to say the very least of it. It is contrary to every principle to allow of such a thing; and I wholly deny the difference which is alleged to

---

*This case and these principles, are cited and approved, 9 Cushing 573, and 5 Rhode Island 168.

exist, between mercantile arbitrations and legal arbitrations. The first principles of justice must be equally applied in every case. Except in the few cases where exceptions are unavoidable, both sides must be heard, and each in the presence of the other. In every case in which matters are litigated, you must attend to the representations on both sides; and you must not, in the administration of justice. in whatever forum, whether in the regularly constituted courts or in arbitrations, whether before lawyers or merchants, permit one side to use any means of influencing the conduct and the decisions of the judge, which means are not known to the other side."

The case before this court is an important one; but it is much more important to preserve a principle which is essential to the proper administration of justice. It is the mandate of the law to the arbitrator, as well as the judge, "You shall not hear the argument and explanations of one party, in the absence of the other, unless the latter had the opportunity to be present; nor shall you hear statements and evidence against either party, if taken in his absence, without notice to him, or opportunity afforded him to cross-examine, or produce explanatory or contradictory testimony." And we may add, "Especially, you shall not make yourself the agent of either party, to collect up evidence for him. Every inference will be made in favor of your award; but these are limits you may not pass."

In *Passmore* vs. *Pettit*, 4 Dallas 271, the Court set aside the report of the referees because they received a paper as evidence which the defendants had no opportunity of examining. The following extract from the opinion will show the principle on which the decision was founded: "All the testimony should be heard, all the documents should be seen, by both parties in the presence of the referees. But it appears that a paper or *ex parte* affidavit, was produced before the referees and umpire, respecting the seaworthiness of the ship, (the very gist of the controversy,) which the defendants never had an opportunity of reading or examining. The referees and umpire are undoubtedly honest men; but they have erred in judgment, and their errors cannot be sanctioned

by an affirmance of their report, which their errors alone may have produced."

The case of *McAllister* vs. *McAllister*, 1 Wash. Va. R. 193, has never, we believe, been controverted by any Virginia decision. In that case, the court set aside an award because improper evidence had been received by the arbitrators, without the consent of the party against whom the evidence was introduced."*

In *Jenkins* vs. *Liston*, 13 Grat. 535, the head-note is as follows: "Arbitrators having received a paper, without the knowledge or consent of one of the parties to the arbitration though they say that their opinions were formed before it was received, their award is void." While the arbitrators were engaged in considering the case, a paper written by a person in Pennsylvania, was put into their hands as evidence by one of the parties to the reference in the absence of the other. The arbitrators testified that they had made up their opinions before it was shown to them, and that they did not use it as evidence. The contents of the paper did not appear. (Page 536-7 of the report.) In the opinion of the court it was said: "It has always been an object of great concern with the courts to keep the administration of justice free, not only from partiality, but also from any suspicion thereof. It is due to all parties, whether asserting or defending their rights in courts of record, or before domestic tribunals of their own choice, that they should hear and know everything alleged or proved in opposition to the rights claimed. If, however, evidence in behalf of one party may be secretly heard, his adversary is deprived of the right to explain or disprove what is alleged to his prejudice. Many cases may be found affirming the position laid down. There is no conflict of opinion in regard to the general principle itself, although there may have been some in applying it to the facts in particular cases. * * * * It may, therefore, be safely declared that an award cannot be sustained, if made in favor

---

*So where the arbitrators rejected proper evidence, Ligon vs. Ford, 5 Munf. 10; Rus. Arb. 178, at (x.)

"If arbitrators refuse to hear testimony material to the controversy, it is unquestionably such conduct as will vitiate the award." Spencer J. 17 Johns. R. 410, 411.

of a party who has secretly offered evidence which has been received by the arbitrators while acting in their capacity as such. Nor will the case be withdrawn from the operation of the general rule, by proof that the award would have been the same without such proof. The law in its jealousy, will not permit an inquiry into the effect of the evidence so received.[*] It tends to partiality and corruption, and nothing less than the complete vacation of the award will satisfy the law. There is no particular reason to impute improper motives to the arbitrators who made the award in question; they probably received the evidence in ignorance of the proprieties of their position."

If the statements of Connelly, Goldthorpe and others had been taken in regular form of depositions, by proper officers, but without notice or any opportunity afforded to us to be present during the examination, it will scarcely be contended that they would have been admissible against us. We would then, at least, have had the security of the oath administered to the witnesses to tell the truth, and the whole truth, respecting the matter in controversy. Are they rendered admissible because they are unsworn statements, as well as *ex parte*.

As we have stated, two of the arbitrators, on the 29th of May, 1871, made the award which will be found on pages 20 to 22 of the record, the third arbitrator dissenting therefrom. Is this instrument an award within the meaning of the 17th section of the act of March 18, 1850, or of any effect? It is alleged in the bill that it is not.

The common law rule upon the subject is well settled.

In *Morse on Arbitration*, page 162, the rule is stated as follows: " Unless the statute or the submisson under which the arbitrators act or derive their authority provide to a contrary effect, or unless a contrary intention of the parties can be clearly and unmistakably gathered from the submission and

---

[*]The rule, that if ex parte statements be improperly received by arbitrators, they cannot be heard to say that it had no influence on their award, appears to be well established. Walker vs. Frobisher, 6 Ves. 70; Dobson vs. Groves, 51 Eng. Com. Law R. 637; Cleland vs. Headley, 5 Rhode Island 168.
Walker vs. Frobisher, 6 Ves. 70, appears to be a leading case on the subject which we have been discussing—See 9 Cushing 572; 51 Eng. Com. Law R. 647-8, 851; 6 Rand. 537; 1 McCord's Ch. R. 484; 5 R. I. 168; 29 Barbour 165.

attendant facts, the rule is general and imperative that all the arbitrators must unite in the award in order to render it valid. A different rule is allowed to prevail in matters of public concern. Where persons are charged with the performance of public duties, the decision of a majority is usually accepted. So it is with a bench of judges, where the concurrence of a majority constitutes the decision of the court. But a submission to arbitration is a delegation of power for a mere private purpose, and the concurrence of all intrusted with the power is necessary to its due execution. The rule is thoroughly established both in England and in the United States. The submission or the statute under which the arbitrators derive their power, may of course stipulate or declare that an award concurred in by a majority shall be valid."

The court will find the doctrine here announced fully supported by the following authorities—all holding that an award by less than the whole number of arbitrators will be void, unless it be otherwise provided, in express terms or by clear implication, in the submission or statute under which the arbitrators act. *Jeffersonville Railroad* vs. *Mounts*, 7 Ind, 669; *Patterson* vs. *Leavitt*, 4 Conn. 50; *Cope* vs. *Gilbert*, 4 Denio 347; *Welty* vs. *Zentmyer*, 4 Watts 75; *Eames* vs. *Eames*, 41 N. H. 181; *Anderson* vs. *Farnham*, 34 Maine 161; *Mackey* vs. *Neill* 8 Jones's Law R. 214; *Norfleet* vs. *Southall*, 3 Murphey's No. Car. R. R. 189, 190-1; *Towne* vs. *Jacquith*, 6 Mass. 46; *Green* vs. *Miller*, 6 Johns. R. 39; *Fetter* vs. *Rapesnyder*, 1 Dallas 293; *Bayne* vs *Gaylord*, 3 Watts 301. These cases we have examined. Morse refers to several others in support of the same rule, but we have not deemed it necessary to consult them. And so far as our researches have extended, we have not seen a case in which an award by less than the whole number of arbitrators was sustained, unless it was, expressly or by implication, provided in the statute or agreement that less than the whole number might decide.

A submission to arbitration, whether by statute or agreement, has been uniformly declared to be a delegation of power for a private purpose. *Jeffersonville Railroad* vs. *Mounts*, 7 Ind. 671; 4 *Conn. R.* 53; 6 *Mass. R.* 50; 6 *Johns. R.* 41.

The cases in which, in the absence of an express provision

to that effect, authority has been implied for less than the whole number of arbitrators to decide, are but very few; and upon examination, it will be found that the implication has been such as to leave no question on the subject. The only cases of this sort which we have found, are *Berry* vs. *Penring*, Cro. Jac. 400; *Sallows* vs. *Girling*, Cro. Jac. 277; *Battey* vs. *Button* 13 Johns. R. 187; *Isaacs* vs. *Beth Hamedash Society*, 1 Hilton 471, 472.

In *Battey* vs. *Button*, 13 Johns. R. 187, the parties agreed to submit a matter in controversy to the decision of two persons, "and in case they could not agree, after due examination and consultation in the premises, then these two were to choose a third person to arbitrate in conjunction with them." The court held an award valid, which was made by the third person so chosen and one of the others, the remaining arbitrator dissenting therefrom. For, as the two were only authorized to choose the third after it had been ascertained that they could not agree with one another, to require the award to be signed by all three, would, said the court, involve a manifest absurdity. It would be to require them all to agree, after it had been ascertained that two of them could not agree.

It is not necessary to notice specially the other cases we have mentioned in which it was held that there was implied authority for less than the whole number of arbitrators to decide, for in neither of them could there be any doubt, from the face of the papers alone, that such was the intention.

Then, does the 17th Section of the Act of March 18, 1850, (for, except this section, there is no other part of the act that has any bearing on the question,) either expressly or impliedly, authorize two of the arbitrators to make an award?

On the contrary, the section expressly provides, that the price at which the city is to purchase the property of the Gas Company, unless agreed upon between the council of the city and the directors of the company, shall be " fixed, ascertained and determined . . . . by the award in writing of *three* persons," to be chosen in the manner prescribed by the section. We take it to be a reasonable construction that when a statute says " three," it does not mean " two," and that under this section the award of two persons would be of no more effect than the award of one.

Plain words are used. There is no ambiguity in the language of the statute; and according to the established rules of construction, the intention must be collected from the words used when they are free from ambiguity. We are not at liberty to insert words or qualifications into a statute to make it conform to our notions of what it ought to be, for this would be legislating. *Sedgwick on Stat. and Const. Law,* 244 to 246; *Woodberry* vs. *Berry,* 18 Ohio S. R. 462; *Denn* vs. *Reid,* 10 Peters 524; *McClusky* vs. *Cromwell,* 11 N. Y. 601; 21 *Howard* 238; 22 *Howard* 191, 293; *Cooley on Const. Lim.* 55.

This section uses throughout the common law terms, *arbitrators* and *award,* and we must give to common law terms their common law signification and effect, unless the act itself clearly indicates an intention to the contrary. If an act of the legislature provides for a jury, we are to understand, without any express provision to that effect, that no verdict can be rendered unless they all agree. If on the other hand it creates a court of several judges, a council for municipal corporation or a board of directors for a private corporation, then a majority may decide in all cases in which the statute does not clearly indicate an intention to the contrary; for such is the common law effect of the expressions used. For the same reason, if it speaks of *arbitrators* and *awards,* we must give those words their common law signification and effect, so far as the statute itself does not otherwise provide; and the award must, therefore, be the unanimous decision of the arbitrators unless an intention to the contrary be clearly exhibited in the law.

But it is argued in the Answer of the City, that two may make an award, because if unanimity be necessary, the right of the city to purchase the property might be defeated by the Gas Company fraudulently appointing as arbitrator some one who would refuse to sign an award. But the difficulty here suggested would not be removed by authority to two of the arbitrators to make an award. The Gas Company might refuse to appoint an arbitrator at all, or might appoint some one who would refuse to concur in choosing the third. So that, after we make out a constructive authority to two to decide, the section would be liable to the same difficulty as before. In truth, the argument of the City, legitimately carried out, will lead to this result—that the arbitrator chosen

by the city may make the award, because otherwise the right of the city to make the purchase might be rendered nugatory by fraud on the part of the Gas Company.

The supposed difficulty, in fact, does not exist. Courts of Equity have jurisdiction of all cases of fraud. Whatever right the city has, if she pursues it by proper and lawful means, and is not herself in default, cannot be defeated or rendered nugatory by any fraudulent contrivance of the opposite party; for a court of Equity, if fraud be proved in such case, will furnish an adequate remedy. There is just a single difficulty here in the case of the city—it is not enough to suggest or allege fraud—it must be proved.

The charter give the city the right to purchase or not at her own option. The risk of the experiment was thrown entirely on the stockholders of the Gas Company. If the undertaking proved profitable, the city, of course, would make the purchase; and the 17th section provided that the profits of the business should not he taken into consideration, in determining the actual value in money of the company's property. If it proved to be a losing concern, the city would not purchase, and the stockholders would lose the money which they had invested. But they were not to be left entirely to the tender mercies of the city authorities. If the city determined to buy, the law intended to secure to the company, at least, a fair equivalent for the property; and the section has, therefore, properly provided in effect, that the company, *acting in good faith*, should not be compelled to part with its property at a valuation in which the arbitrator selected by itself did not concur. If the company acted fraudulently to prevent an award, or the city, on the other hand, attempted by fraud or force to enforce an award improperly procured, the remedies of the parties respectively must be sought from the proper judicial tribunals.

But it is supposed that the question, whether in this case two of the arbitrators could make an award, is controlled by the rule of construction to be found in the Code of Virginia of 1849, page 100, rule third. This rule, in the same words, may be found in the Code of 1860, page 114. It is as follows: " *Third.* Words purporting to give authority to three or more public officers or other persons shall be construed as giving

such authority to a majority of such officers or other persons, unless it shall be otherwise expressly declared in the law giving the authority."

This was a new provision introduced into the Code of 1849, and with the other provisions of the Code took effect on the first of July 1850; the last chapter, (*Chap.* 216, Code of 1849, page 800; Code of 1860, page 861,) providing that "All the provisions of the preceding chapters shall be in force upon and after the first day of July next."* There was no such law in Virginia prior to the 1st of July 1850, for this rule took effect on and *after*, and not on and *before* that day.

The charter of the Gas Company was passed March 18, 1850, and it was expressly enacted by the 18th and last section that it should take effect from and after its passage. (*Va. Sess. Acts*, 1849-50, page 156.) The charter, including the 17th Section which we have been considering, was therefore in force on the 18th of March 1850, while Rule third was not in force until July 1, 1850.

Upon the inducements offered by the charter and the City Ordinance of April 29, 1850, the capital stock of the Gas Company was subscribed, and the company organized and put in operation on the 11th of May 1850. The contract thus constituted between the Gas Company on one side, and the State of Virginia and City of Wheeling on the other, was complete, and the rights of the company under the 17th section as well as the other provisions of its charter, were vested and fixed beyond recall, before rule 3d had gone into operation. The Legislature had not reserved any right to alter the charter; and therefore, even if it had intended by the adoption of this rule to change the operation and effect of the 17th section, it could not do so, for all the rights of the company under its charter were protected by the provision of the Constitution of the United States, that no state shall pass any law impairing the obligation of contracts.

But no change was intended. When the Legislature declared that the charter should take effect on the 18th of March 1850, and that Rule 3d should not be in force until July 1, 1850, they in effect declared that the latter should not apply

---

*The Code was passed in August 1849. Code of 1849, page 47.

to or control the operation of the former, for this would be to give force and effect to the latter before the 1st of July 1850.

The 18th section of Chapter 16 of the Code, (*Code of* 1849, *p.* 101-2 ; *Code of* 1860, *p.* 115-116,) shows clearly the effect of the provision suspending the operation of Rule 3d until July 1, 1850. No right accrued or claim arising before that day could be in any manner whatever affected by that rule. The words of this 18th section, leaving out such of them as have no application to the case in hand, are as follows: "No new law shall be construed in any manner whatever to affect any right accrued or claim arising before the law takes effect."

Having obtained the award of the two arbitrators, the city authorities proceeded to put it into execution, in military style, by a surprise. They seem to have determined that no time should be allowed the enemy for consultation or preparation.

The award was made on Monday, the 29th of May, and accepted by the City Council at a meeting held on the evening of the 30th, and the Mayor, with the Gas Commissioners previously appointed by the city, directed to carry it into effect. Taking it for granted, without inquiry that the Gas Company would not consider itself bound by the supposed award, the 31st of May and part of the 1st of June, appear to have been applied by the Mayor and commissioners to negotiating for, and obtaining by loan or otherwise, the necessary quantity of legal tenders to be offered to the company. No notice of these proceedings seems to have been given to the company ; and the first intimation which the company or any of its officers had, that a tender of the amount awarded would be made, was obtained by accident during the forenoon of Thursday, the 1st of June.

On the afternoon of that day, the Mayor and commissioners made a formal tender of the money, at the office of the Gas Company on Monroe street, to the president and secretary of the company, along with a deed to be executed by the company for its property and works ; and a paper was read to them by the Mayor claiming possession of the property. The officers of the company declined to receive the money, assigning as a reason that they had no authority to receive the same, and stating that a meeting of the directors of the com-

59

pany would be held next day, the second of June, to consider the matter. The Mayor and commissioners thereupon deposited the money in the Merchants' National Bank of West Virginia at Wheeling, subject to the order of the Gas Company, and then proceeded to the works and took possession of the same; and the city has ever since retained possession.

The officers of the company had no authority to take the money or execute the deed, involving as it did the transfer of the charter of the company, and the extinguishment of its corporate existence as well as the sale of all its property and privileges. Their action in the case was eminently proper, to call a meeting of the directors at the earliest moment possible to consider the matter.

It is said in 2 *Parsons on Contracts*, p. 639–640, Edit. of 1866, that "a tender need not be made to a creditor personally; but it must be made to an agent actually authorized to receive the money." But it is scarcely necessary to cite authorities for the proposition that a tender to an officer or agent not authorized to receive the money is of no effect whatever as against the principal. In the present case, even if the award was valid, the tender was a useless and unavailing ceremony. The city should have given notice of what it demanded, to the company through its president or secretary, and awaited for a reasonable time the action of the proper authorities of the company in relation to such demand. If they refused to comply, (and any unreasonable delay on their part in responding to the demand would be equivalent to a refusal,) the rights of the city, whatever they might be, would be complete.

It is provided by the 17th section of the act of March 18, 1850, that after an award of "three persons" made in conformity with that section, then, "Upon complying with the terms of the award thus made, the said company shall, by proper deeds or other instruments in writing, convey and assure to the said city of Wheeling the said lots of grounds, buildings, apparatus, works, fixtures and property of said company, together with this charter;" and "upon said purchase being made as aforesaid, this charter, together with all the franchises, rights and privileges granted, or intended to

COURT OF APPEALS OF WEST VIRGINIA. 467

July Term,        Wheeling Gas Co. vs. The City of Wheeling.        1872

be granted under it, shall be vested in the city of Wheeling."

The award of itself, even if properly made, conveyed no title to either the property or the charter of the Gas Company; and even if we suppose the award to be valid, and the tender to have been duly made, the city took possession of property to which it had no title, and is exercising privileges and franchises which have never been vested in it.

These provisions, no doubt, were put into the act in their present form, in order to protect the rights of both parties. An award might be improperly made; and, we think, the case here supposed has actually happened. Before it could be required to transfer its property and charter, the company would have the right to show, if it could, that the award was not such a one as it was bound to respect or obey. On the other hand, if a proper award was made and the city was ready and willing to comply with it on her part, then, if the Gas Company refused or unreasonably delayed to execute the proper deeds or other instruments of writing, a bill for the specific performance of the award would furnish a ready and adequate remedy for such default. *Jones* vs. *Boston Mill Corporation*, 4 Pick. 512 to 515; *Akely* vs. *Akely*, 16 Vermont, 450; 2 Sto. Eq. § 1458. a.

When the money was tendered on the 1st of June, a deed for its property and charter to be executed by the Gas Company was also tendered. An hour afterwards the city had taken possession of the property and seized upon the franchises. The eagerness of the city authorities would brook no delay. There was hardly time to read the paper; and certainly none was allowed for the officers of the Gas Company to consult counsel and take advice upon it, in order to ascertain whether it was such an instrument as the company ought to execute, or obtain from the directors or the stockholders the necessary order for its execution.

Yet for two hundred years at least, it has been regarded as settled law, that "where one is bound to seal a deed, he may require a reasonable time to show it to counsel." *Symmes* vs. *Smith*, W. Jones's Rep. 314. Even if the deed was all right, and such as ought to have been executed, we were not bound to respond *instanter* to the demand for its execution.

We do not propose to examine the evidence found in the record respecting the proceedings of the city commissioners and police officers in seizing upon the property and franchises of the Gas Company immediately after the tender; nor to expose the miserable pretence, on which the city seems to rely, that the company voluntarily surrendered possession to the city. The superintendent and hands in the employment of the company at the works had no authority to surrender the property and rights of their employer to another, nor does the evidence show that they did so. But even if it were true that the city authorities took advantage of their ignorance or their necessities to induce them to make such surrender, it certainly would not mitigate the outrage which was practiced upon us. Nor do we propose to discuss the doctrine that the city is under no obligation to assert her rights, whatever they may be, before the judicial tribunals to which we all look for protection, but in the exercise of the sovereign rights which have been claimed for her, may use the force that she controls to seize and hold whatever property or privileges she supposes herself to be entitled to. We take it for granted that such doctrines can have no countenance here, and that the strong and the weak are all equal before the law.

We trust that there is enough in the record to satisfy your Honors that the city took possession of our property and franchises, without title thereto. She can, therefore, derive no advantage from the possession thus obtained. "It is a maxim of law recognized and established," says Broom, (*Legal Maxims*, p. 275 to 295, marginal paging, 6th Am. Edit.) "that no man shall take advantage of his own wrong; and this maxim, which is based on elementary principles, is fully recognized in courts of law and equity, and indeed admits of illustration in every branch of legal procedure." Repeating the language of Lord Cottenham in *Hawkins* vs. *Hall*, 4 Mylne & Craig 281, he states it to be a principle invariably acted upon by courts of equity, that "the author of a wrong, who has put a person in a position in which he has no right to put him, shall not take advantage of his own illegal act; or in other words, shall not avail himself of his own wrong." This principle is older than the common law itself for it was fully recognized and asserted more than thirteen hundred

years ago in the Digest of Justinian—"*nemo ex suo delicto, meliorem suam conditionem facere potest*"—no one can make his own case better by his own wrong; a rule which we commend to the attention of our city authorities, both with reference to the present case, and others of similar character.

Perhaps we do not comprehend the difficulties which the Judge of our circuit court intimated to exist upon the question of jurisdiction; for we must take the liberty of saying, the authorities on that point of the case seem to be clear, decided and uniform.

Unquestionably, a court of equity has jurisdiction to set aside an award, if misbehavior or partiality on the part of an arbitrator be shown. We have already cited authorities to that point, and shall not repeat them; and this principle alone is sufficient to sustain our bill, on the question of jurisdiction. But the Judge of the court below did not feel himself at liberty to look into the record to ascertain what were the facts, or whether there had been misbehavior and partiality or not.

If our argument has not been wholly unsuccessful, we have the sole and exclusive privilege of using the streets, alleys and public grounds of the city of Wheeling for the purpose of lighting said city with gas, and of exercising the franchises conferred upon us by our charter for the purposes contemplated by it, until that privilege and these franchises shall have terminated in the manner prescribed by law. These are rights which have been granted to us by statute, "the assent of the council of said city, being first had and obtained." We may therefore resort to a court of equity to defend them from invasion.

"An injunction," says Judge Story, (2 *Sto. Eq.* 8th Edit. p. 108, Sect. 927,) "will be granted in favor of parties possessing a statute privilege or franchise to secure the enjoyment of it from invasion by other parties."

So, in 2 *Redfield on Railways*, 3d Edit. pages 342 to 344, it is stated that "Equity exercises a jurisdiction of a preventive character, by way of injunction, in regard to alleged infringements of the exclusive franchises of corporations, which is of a very important character." After mentioning several decided cases, the author adds: "There are many other cases

taking substantially the same view of the propriety of equitable interference to protect corporations against infringements of their corporate franchises."

Direct decisions to this effect will be found in the *Boston Water Power Company* vs. *Boston & Worcester Railroad*, 16 Pick. 512, (see opinion of Chief Justice Shaw, pages 520, 525, 526;) *Boston & Lowell Railroad* vs. *Salem & Lowell Railroad*, 2 Gray 1, 21, 27; *Enfield Toll Bridge* vs. *Hartford & New Haven Railroad*, 17 Conn. 65-66.

The celebrated case of the *The Charles River Bridge* vs. *Warren Bridge*, 7 Pick. 344 and 11 Peters 420, was a bill in equity filed by the Charles River Bridge asking for an injunction to protect itself in the enjoyment of the exclusive privilege which it claimed under its charter. The case occupies near two hundred pages in Pickering's report, and over two hundred in Peters', and was discussed by able counsel and decided by able judges; but it never occurred to the counsel or the court that the case was one of which the court of equity had not jurisdiction. The *Bridge Proprietors* vs. *Hoboken Company*, 1 Wallace 116, and the *Binghampton Bridge*, 3 Wallace 72, were cases of the like kind, in which it did not occur to the counsel or the court that there was any difficulty about the question of the jurisdiction of a court of equity to secure by injunction a statute privilege or franchise from invasion.

In the case of *Osborn* vs. *The Bank of the United States*, 9 Wheat. 738, the Bank sued in equity to protect itself in the enjoyment of its corporate franchises, and the question was directly raised whether the case was one of equity jurisdiction. "The 5th objection" said Chief Justice Marshall, page 838, "is, that the case made in the bill does not warrant the interference of a court of chancery." A few sentences from his opinion will show how this objection was disposed of. "The appellants," he said, page 841, "admit that injunctions are often awarded for the protection of parties in the enjoyment of a franchise, but deny that one has ever been granted in such a case as this. But although the precise case may never have occurred, if the same principle applies, the same remedy ought to be afforded. The interference of the court in this class of cases has most frequently been to restrain a person from violating an exclusive privilege, by participating

in it. But if, instead of a continued participation in the privilege, the attempt be to disable the party from using it is not the reason for the interference of the court rather strengthened than weakened? * * * * It requires no argument to prove that the injury is greater, if the whole privilege be destroyed, than if it be divided," &c.

The principle is very clearly laid down in the case of the *Central Bridge Corporation* vs. *City of Lowell*, 4 Gray 479-480. " The case set out in the bill," says the court, " is clearly within the equity jurisdiction of the court. The plaintiffs are a corporation established by an act of the Legislature, which confers upon them a franchise of a public nature ; they are, and for a long time have been in the possession and enjoyment of this franchise and in the exercise of the rights and duties with which they are clothed by their charter ; the acts of the defendants alleged in the bill and admitted by the answer, if illegal and without right, tend directly to the disturbance, dispossession and destruction of their franchise, and to the deprivation of all the rights and privileges conferred upon them by law. There can be no doubt that such a injury and invasion of the rights of a corporation are in legal contemplation a nuisance, and that the only full and adequate remedy therefor is to be found in a resort to the equity powers of the court."

On the 16th of June 1871, the Gas Company commenced an action of unlawful entry and detainer against the City, the Gas Commissioners, the Mayor and his policemen, to recover possession of the lots which the defendants had seized upon. This suit is still pending ; and the City in its Answer sets it up as a bar to our suit in equity.

According to the *Code of West Virginia* chap. 89, 517, if an unlawful or forcible entry be made upon lands, the party so turned out of possession, *no matter what right or title he had thereto*, may recover the possession by the writ of unlawful entry and detainer. By that suit, therefore, we may recover possession of certain lots of ground, if we show that the city or her agents unlawfully entered upon or dispossessed us of the same ; but we recover for the unlawful entry, no matter what right or title we have thereto. The suit will decide nothing respecting the right or title ; nor will it restore to

us, the privileges and franchises of which we have been deprived. For them, our only remedy is by bill in equity to restrain the city and its agents from interfering with our corporate rights. The suit at law, and the suit in chancery are, therefore, distinct in their object and effect.

But if they were both for the same purpose, and co-extensive in their object and effect, a suit at law cannot be pleaded in bar or in abatement of a suit in chancery. If both are pending at the same time, a court of equity, on the petition of the defendant, may require the plaintiff to elect which suit he will prosecute. Sto. Eq. Pleading §742.

We do not controvert the rule that a disputed title to land is the proper subject of an action of ejectment. Unless a court of equity, upon other grounds, has jurisdiction of the case, the plaintiff must resort to the appropriate action at law to establish his title. But a statutory privilege or a corporate franchise cannot be recovered by an action of ejectment. We cannot at law effectively enforce our exclusive right to use the streets, alleys and public grounds for the purpose of lighting the city with gas, or secure ourselves against molestation in the exercise of the franchises conferred by our charter. We cannot at law have an account of the profits made by the city, or which she ought to have made, during her usurpation of our franchises and privileges; and this of itself would furnish sufficient ground of equity jurisdiction. And the court of equity having properly jurisdiction of the cause on any ground, and having proper parties before it, will decide the whole case and do complete justice between the parties, even when one or more of the matters in controversy, if it stood separate and alone, would be the proper subject of an action at law.

An action of ejectment is strictly confined to the title to *land.* An easement, or the privilege which one party may have in or over the land of the other, cannot be recovered by ejectment; nor will an action of trespass lie for any interruption or molestation in the exercise of the right. *Warwick* vs. *Mayo,* 15 Grat. 545 to 550; *Bolling* vs. *Mayor of Petersburg,* 3 Rand. 563, 572 to 57↓. The right to use the streets &c. for the purpose of lighting a city with gas is a mere easement. *Washburn on Easements,* p. 601 of 2↓ Edit. (marginal paging, 513-

514; and says Judge Story, " Where easements or servitudes are annexed by grant, covenant or otherwise, to private estates * * the due enjoyment of them will be protected against encroachments by injunction." 2 *Sto. Eq.* 8th Edit. p. 108, §927.

The case of the *Attorney General* vs. *the Sheffield Gas Consumers' Company*, 19 Eng. Law & Eq. R. 639, 3 D. M. & G. 304, S. C. was cited for the city during the argument in the circuit court. But we trust the opposite counsel will excuse us for saying that it has no application to the present case. It was in substance as follows :

The Sheffield United Gas Light Company, incorporated for lighting Sheffield with Gas, had the privilege of using the streets for laying down and repairing their mains and pipes. After they had been in operation some years, a new company, the Sheffield Gas Consumers' Company was organized for the same purpose ; and when the new company were about to commence operations, the old one filed a bill for a perpetual injunction to restrain the new company, from digging up the streets or damaging the mains or pipes of the plaintiffs, which it was alleged they must do to a very great extent. Subsequently the Attorney General was made a party and the bill was turned into an information and bill, with an additional allegation that if the defendants were allowed to proceed, their works would cause a public nuisance, continuously recurring. The court upon the evidence, at the hearing dismissed the information and bill, holding that there was no such injury to the mains and pipes of the plaintiff, or such obstruction of the streets to be apprehended, as to justify the interference of a court of equity upon the ground, either of private injury or public nuisance.

Our case is one for the redress of private wrong, and the doctrine of public nuisance is not involved. In the case of the Sheffield Gas Companies, it will be perceived, that while the old company had a right to use the streets for laying down and repairing their mains and pipes, they had not *an exclusive right.* They had a right themselves to use the streets for that purpose—they had no right to exclude any other party from using the streets for the like purpose, except upon the ground that such use would necessarily damage the mains

and pipes which they had laid.   And so far as the question of an infringement of private right was concerned, this was ground upon which the case of the plaintiffs was put—there was no pretence that there was any thing in the act of parliament to confer upon the old company a right to the exclusive use of the streets for the purpose of lighting the town with gas.   But in our case the statute is clear upon the point.

It was argued in the court below, that even if there was misconduct and partiality in the conduct of the arbitration, and evidence was improperly received against us without our consent, yet as we have not shown the sum awarded to be inadequate, we have proved no damage and therefore are not entitled to relief.

We think it does not appear upon the record that the award does not give us a just compensation for our property; though it will be manifest on the whole case, that the plaintiff, while endeavoring to show that the arbitration was improperly conducted, did not suppose it to be proper to investigate the question of value, any farther than it might bear upon the question of misconduct and partiality.

If the arbitration was improperly conducted and *ex parte* evidence improperly received against us without our consent, the effect of such evidence is immaterial.   Principles which are essential to the administration of justice, and which must be maintained inviolate, are involved;  and the law in its jealousy will not permit an inquiry into the effect of the evidence so received, or of the influence so exerted.   The award is void, even if it were shown affirmatively that the decision would have been the same if it had not been made under improper evidence.   *Jenkins* vs. *Liston.* 13 Grat. 535 ; *Dobson* vs. *Groves,* 51 Eng. Com. Law R.  637 ;  *Walker* vs. *Frobisher,* 6 Ves. 70 ; and other cases before cited.

The two arbitrators have awarded $73,637 50 to us as the value of the property, without taking into consideration the value of the franchises of the charter or the profits of the business.   But we are entitled to those franchises and profits, until our right thereto has been terminated in conformity with the provisions of our charter.   If, as we suppose, it has never been terminated, we are now entitled to them.   The city has dispossessed us, in violation of the law, of franchises,

business and property, and tell us: You have not been injured for we offer you the value of the property alone.

*Wheat & Forbes* for the appellants also submitted, in substance, the following remarks:

The controversy between the parties to this suit has grown out of the 17th section of the act to incorporate the Wheeling Gas Company, and the very extraordinary proceedings of the corporate authorities of the city of Wheeling, in clear violation, not only of the letter but also of the true intent and meaning of that section. Before discussing that section, we beg leave to call attention to the following rules of interpretation:

Potters' Dwarris on Statutes, &c., Rules 2, 9, 10, 18, 19 and 20 of American Rules, pages 143-4-5 and 6, and the cases cited:

*Jackson* vs. *Lewis*, 17 Johnson, (N. Y.) 475; *The People* vs. *N. Y. Cent. R. R. Co.*, 13 N. Y. 78; *Weller* vs. *Harris*, 20 Wend., (N. Y.) 561-2; *M'Cluskey* vs. *Cromwell*, 11 N. Y. 601-2.

The seventeenth section of the act incorporating the Wheeling Gas Company has no need of interpretation. It is expressed in clear and precise terms; its sense is manifest, and leads to nothing absurd; there can be no reason *not* to accept the sense which it naturally presents. "To go elsewhere in search of conjectures, in order to restrain or extinguish it, is to elude it."

A brief analysis of the section will demonstrate the necessity of observing the rules which have been cited.

The *first* clause grants to the Gas Company "the sole and exclusive privilege of using the streets, alleys and public grounds of said city for the purpose of lighting said city with gas, for the full term and period of thirty years from the time said company shall commence the supply and distribution of gas, of which time notice shall be given by said company, to be entered amongst the records of said city; the assent of the council of said city being first had and obtained, as herein before provided."

It is denied that the General Assembly of Virginia had the power to grant this sole and exclusive privilege—*first*, because such grant was contrary to the fourth article of the bill of rights prefixed to the Constitution of Virginia, "that no man,

or set of men, are entitled to exclusive or separate emoluments and privileges from the community, but in consideration of public services, which not being descendible, neither ought the offices of magistrate, legislator or judge to be hereditary;" and *second*, because such grant is contrary to public policy.

If this question should be at all material in this case; if the right to use the streets and alleys was a matter in controversy, it would not be difficult to show, under the authorities cited on the other side, that the plaintiff, the Gas Company, held and enjoyed this right as a matter of contract, as set out in their charter, both with the State of Virginia, (the State of West Virginia), and the city of Wheeling. It is respectfully submitted that the cases cited: The Norwich Gas Light Co. vs. The Norwich City Gas Co., 25 Conn.; M'Cune vs. Norwich City Gas Co., 30 Conn., are not analagous either in the facts admitted or proven, or in the propositions of law applied by the court. In the latter case the court simply decided, that "in the absence of any contract, express or implied, *and where the charter of the company contains no provisions on the subject*, a gas company is under no more obligation to continue to supply its customers, than the vender of any other article." In the former, the court determines that the claim of the Norwich Gas Light Co. to the exclusive use of the streets and alleys of that city is a monopoly, and therefore against the Declaration of Rights, Art. 1, of that State; [which, so far as it has been quoted in the opinion of Hinman J., seems to be substantially the same as the provision in our State Constitution before quoted,] and that the grant of such exclusive use of the streets, &c., was against public policy. The distinction taken in this opinion between the charters for ferries and bridges, and those ordinarily granted to gas companies, is very proper for consideration of this court, in examining the act of the General Assembly incorporating the Wheeling Gas Company. It is respectfully submitted that this act grants to plaintiff its franchises and privileges, upon terms and conditions, constituting a valid and sufficient consideration, at least so far as the city of Wheeling is concerned.

Without adverting to the various terms and conditions, in relation to the protection of the use of the streets, in the laying down and repairing of the mains; the limitation of the price at which gas shall be furnished to private consumers; the

obligation laid on the company to furnish consumers necessary burners and other fittings, upon contracts between them and the company; and others of like character, we call your attention to the clause requiring the company to furnish gas to the city of Wheeling as a corporation, " for lighting the public buildings, streets, alleys and public grounds, at a rate not exceeding that charged to the city of Pittsburgh by the gas company of that city; the duty imposed upon the company, to supply gas to lines of pipes laid down by the city, to furnish gas to the street-lamps beyond the range of the mains laid down by the company; the obligation imposed upon the company, to complete their works, " with sufficient apparatus to supply gas for not less than two thousand burners, and lay down not less than ten thousand feet of gas pipes for conducting said gas through the streets, alleys and public grounds of said city on or before the 1st day of December, 1851, and several others of like kind. But especially do we call attention to the proviso of the seventeenth section under which this controversy has arisen. We think, as before stated, that the charter of this company is a tri-parte contract between the State, the city and the company; and if it were at all material to the questions now before the court, it could be shown that the exclusive right to the use of the streets and alleys of the city has been vested in the plaintiff.

The submission provided for in the seventeenth section being statutory, its terms and provisions are not within the control of either party. On the one hand is a municipal corporation claiming to represent the whole population of the city, and on the other a private stock company, the value of whose stock, property, franchises and privileges, are of course at all times greatly dependent upon the favorable consideration of the same people; and what is of far greater interest and importance, its very continued being and existence depend upon the true intent and meaning of this section, and its honest and faithful observance and fulfilment. It may very reasonably be presumed, that all the terms and stipulations contained in this section, were carefully considered by all interested before embodied in it. The record shows, in the bill, the answer of the City of Wheeling and exhibits, that the terms, stipulations and condition of this section,

478          COURT OF APPEALS OF WEST VIRGINIA.

July Term,       Wheeling Gas Co. vs. The City of Wheeling.          1872.

were the subject of negotiation between the city and the project ors of this Gas Company, before the passage of the act; and between the city and the commissioners named in it, after its passage.

In his "Conflict of laws" 17, the learned Justice Story says —"arguments drawn from impolicy, or inconvenience ought to have but little weight. The only sound principle is to declare *ita lex scripta est*, to follow and obey. Now if a principle so just could be overlooked, could there be well found a more unsafe guide in practice, than mere policy and convenience. Men, on such subjects complexionally differ from each other; the same men differ from themselves at different times. The policy of one age may ill suit the wishes and policy of another. The law is not to be subject to such fluctuations." In the case of *Hadden* vs. *the Collector*, [5 Wall, S. C. R. at p. 111,] Justice Field says, "What is termed the policy of the government with reference to any particular legislation is generally a very uncertain thing, upon which all sorts of opinions, each variant from the other, may be formed by different persons. It is a ground much too unstable upon which to rest the judgment of the court in the interpretation of statutes. It is idle therefore to contend, that the Legislature intended any thing else than is expressed in the language of the statute, because of any supposed policy, plans or purposes, of either of the parties to this statute; nor can the mode of accomplishing any intent of the statute be improved or in any manner changed, by any consideration of convenience or inconvenience; to all such 'tis enough to say,—'tis not so set down in the law."

It is true, that the section under consideration, intends to confer upon the city of Wheeling the right to purchase the property of the company, and acquire upon completing the purchase thereof, in the mode therein provided, the rights, privileges and franchises conferred upon the company by the act. But these things can only be done in the mode provided by the section itself, in the absence of any agreement between the city and company.

As was said by Baldwin J., in delivering the opinion of the court, in *Voorhees* vs. *Bank of the United States*, [10 Peters 471], "a proviso, in deeds and laws. is a limitation or exception to a grant or authority conferred; the effect of which is to de-

clare, that the one shall not operate, or the other be exercised, unless in the case provided." The seventeenth section enacts that the plaintiff should have the sole and exclusive privilege of using the streets, alleys and public grounds of the city for the purpose of lighting the said city with gas, for the full term and period of thirty years, from the time said company should commence the distribution and supply of gas; then follows the *proviso,* authorizing the purchase of the company's property by the city, and the exercise of its franchises and privileges, by the acquisition of its charter. Permit us briefly to analyze the proviso. It is so simple and plain as to need no interpretation,

*First*—" Upon the expiration of twenty years from the commencement of said exclusive privilege hereby granted, and within six months thereafter, the City of Wheeling shall have the right" *to purchase the property of the Company.* It may be here remarked, that throughout the whole of these proceedings, the authorities of the City, and their legal advisers, have acted as if this right to purchase was in effect the same as the right to condemn the lands of an individual citizen, for the public use, under the writ of *ad quod damnum ;* or under the provisions of the 52d Ch. of the Code.

*Second.*—" At the price and upon the terms to be agreed between the council of said City, and the directors of said company, or, *to be fixed, ascertained and determined in the following manner ; By the award in writing of three persons,* to be chosen, the first by the Directors of the said Company, the second by the council of said City, and the third by the two thus chosen."

There is nothing in this submission, to indicate that an award might be made by any less number than three : and therefore the common law must prevail, and the award to be valid and binding, must be made by the three arbitrators. " Unless the statute or the submission, under which the arbitrators act and derive their authority, provide to a contrary effect, or unless a contrary intention of the parties can be clearly and unmistakably gathered from the submission and attendant facts, the rule is general and imperative that all the arbitrators must unite in the award in order to render it

valid. A different rule is allowed to prevail in matters of public concern. Where persons are charged with the performance of public duties, the decision of a majority is usually accepted. So it is with a bench of judges, where the concurrence of a majority constitutes the decision of the court. But a submission to arbitration is a delegation of power for a mere private purpose, and the concurrence of all entrusted with the power is necessary to its due execution. The rule is thoroughly established both in England and the United States."

See *Morse* on Arbitration and Award, p. 162 and the cases there cited.

*Third.*—" *Upon complying with the terms of the award thus made, the said company shall by proper deeds or other instruments in writing,* convey and assure to said city of Wheeling, the said lots or grounds, buildings, apparatus, works, fixtures and property of said company, *together with this charter,* to be hereafter held used and enjoyed by the said city for the benefit of the inhabitants thereof."

By this clause, the act provided the mode, in which the title should be vested in the city of Wheeling, as well to the property of the Company, as also to the charter. The conveyance by the Company to the City, of all their property together with their charter, was a condition precedent to their acquisition by the latter.

*Fourth.*—" *Upon said purchase being made as aforesaid,* this charter, together with all the franchises, rights and privileges granted, or intended to be granted under it, shall be vested in the said city of Wheeling for the common benefit of the inhabitants thereof."

This clause confirms the view presented under the preceding one, that the conveyance of the company, by deed or other proper instrument in writing, was intended to be a condition precedent. It was surely not intended that the authorities of the city of Wheeling should determine the validity of any award that might be made, and upon a tender of the amount therein named, [even when legally made,] should forcibly enter upon the possession of the property, franchises, rights and privileges of the Company. The claim that this possession was surrendered by the Company, is, as shewn by

the record in this case, *utterly false and untrue*, and the flimsiest of the many pretenses made and acted upon by the authorities of the city and their advisers. The whole proceedings may be justly characterized, as a high handed outrage upon the plaintiff's rights.

*Fifth.*—" And if upon the expiration of said term of twenty years, the said city of Wheeling shall not make the said purchase, *in the mode and upon the terms prescribed by this section*, the said city shall have the right to make the said purchase upon the expiration of any and every succeeding five years, *upon the same terms and in the same mode*, at least six months' notice of such intention being given in writing to said company by said city ; and all contracts or other acts of said company, which shall be made, entered into or attempted, for the purpose of lessening, impairing or reducing the value of said lots or grounds, apparatus, pipes or fixtures, rights, franchises and privileges, made in anticipation of the said purchase, shall be utterly null and void."

Upon being notified of the pretended award, although the city by its officers and agents, backed by the police, had taken possession of the property of the company, with the strong hand and maintained that possession by measures of intimidation, the officers of the company, the President, Secretary and Directors, awaited until after the 30th of June 1871, the expiry of the six months after the expiration of the twenty years, for a further development of the very extraordinary proceedings of the authorities of the city. They anticipated that proceedings would have been instituted to enforce the specific performance of the award, in which suit all questions could have been fully and fairly tried, and finally determined by the tribunal established by the Constitution and laws of the State. Disappointed in this expectation, on the 16th of June 1871, under the instructions and by the authority of the Directors of the company, a writ of unlawful entry and detainer against the city of Wheeling and others, was sued out of the Clerk's office of the circuit court for Ohio county to recover the possession of the real estate of the plaintiff, upon which the said city, by its agents and officers, had unlawfully entered ; and after the six months had elapsed within which the City had the right to purchase the property of the com-

pany and acquire its rights, privileges and franchises, on the 6th of July 1871, the plaintiff filed the bill in this cause, and prayed " that the said defendants and each of them, and all other officers and agents of the city of Wheeling, be severally enjoined and restrained from interfering with, controlling or operating the works of the company, the plaintiff; from manufacturing, distributing or selling gas and collecting the price thereof from consumers ; from interfering with the sole and exclusive privilege of the plaintiff of using the streets, alleys and public grounds of said city for the purpose of lighting said city with gas, subject to the restrictions and limitations contained in said charter ; or with the right of the company to manufacture and sell gas to be used for the purpose of lighting the city of Wheeling, and the streets and public places thereof, and any buildings and houses therein contained, and to use, operate and manage the works and apparatus of the plaintiff for that purpose; and from preventing, obstructing or interfering with the exercise by the plaintiff of all and singular the powers and privileges conferred upon it by its charter for the purposes aforesaid."

Plaintiff further prayed " that the said City of Wheeling may be compelled to account for and pay over to the plaintiff all the moneys which have been, or may hereafter be collected and received by its agents, from the sale of gas, and the products of the manufacture of gas ; and also all moneys which ought to have been so collected and received ; and all losses which the plaintiff has sustained or may hereafter sustain by reason of the unlawful acts of the said defendants and each of them. The plaintiffs also ask such other and general relief as the court may see fit to grant."

The city of Wheeling and two of the other defendants having severally answered, and the City having demurred, on the 18th of July 1871, by consent of parties, it was ordered, that the cause should come on to be finally heard on the 1st of August then next, on the bill, answers, demurrer, &c., and such depositions, &c. Upon the final hearing, and after argument of counsel, upon the 12th of March 1872, the court adjudged, ordered and decreed, " that the injunction prayed for by the complainant be refused, *and the bill of complainant be dismissed*," with costs to the defendants.

Before considering the first objection raised by the defendants to the prayer for an injunction, that the court has no jurisdiction to award it, in such a case, it is proper to remark, that the prayer of the bill is two fold, and therefore if, upon final hearing, the Judge was of opinion that the court had not jurisdiction to award an injunction as prayed for, and refused it, surely it was error to dismiss the bill. The 17th section of chapter 138, page 633 of the Code provides : " Where an injunction is wholly dissolved, the bill shall stand dismissed, of course with costs, unless sufficient cause be shown against such dismission. The court shall enter such dismission on the last day of such term." Upon comparing this section with the 14th section of chapter 179, p. 738 of the ·Code of Virginia of 1849-1860, it will be found that the following words have been omitted from the Code of West Virginia : " when the case is in the circuit court, at the next term, and when it is in an inferior court, at or before the second term after the dissolution, whether monthly or quarterly." Of course, the omission does not affect the question as to the dismissal of the bill with costs, simply for the reason that the Judge came to the conclusion, that the plaintiff was not entitled to the relief by injunction. In the R. C. of 1819 of Virginia, the same provision is found in section 60, chapter 66, ' p. 208, and in no wise amended by the act of 16th of April 1831, in any manner affecting this question.

The same provision is found in the act of January 20, 1804, section 3. (R. C. of 1808, vol. 2, p. 29.) I have traced this provision to the act of 1804, for the purpose of showing that where injunction has been awarded, and therefore wholly dissolved, it is not proper to dismiss the bill, where, from the prayer of the bill and allegations upon which the prayer is founded, the plaintiff shows equity in his bill, apart and distinct from the prayer for an injunction. In *Pitts* vs. *Kidwell*, decided in the Supreme Court of Appeals in February 1812, (3 Munf. 88,) the court held that an appeal from an *order* dissolving an injunction could not be taken, but only from the dismission of the bill; and it was further held, "it is not competent to a complainant *to dismiss his own bill*, and then object, in an appellate court, that the prayer thereof has not been decreed in his favor." In the case of *Hough* vs. *Shreeve*,

(4 Munf. 490,) the court says "that, as the bill of the appellant had a double or two-fold object, first, to enjoin the appellee, *Benjamin Shreeve*, from harrassing him with vexatious actions of trespass, and secondly, to obtain a decree for the overflowed land in controversy, the cause is not within the intent or meaning of the 3d section of the act of the 20th of January 1804." This was in 1815. In the case of *Singleton* vs. *Lewis and others*, (6 Munf, 397,) the same point was decided as in the last case, that a bill of injunction ought not to be dismissed at the next term after dissolution under the same act, if such bill have other objects, besides those embraced by the injunction. This was in 1819. In *Pulliam* vs. *Winston and another*, (5 Leigh 324, in 1834,) under the same provision as in our Code, the court say : " But there can be no question that this decree must be reversed, upon the authority of the cases of *Hough* vs. *Shreeve* and *Singleton* vs. *Lewis*. In those cases it is decided, that the provision of the statute under which the county court proceeded in dismissing the bill, does not apply to a bill which is not merely a bill of injunction, but has other objects besides those of enjoining a judgment at law."

It is conceded on all hands, that the circuit Judge, having come to the conclusion that he could not award the injunction prayed for by the plaintiff, decided nothing else, and dismissed the bill. In doing so, he certainly erred. The case, it is true, came on for final hearing, and it cannot be claimed that this was a dismissal under the statute, for the reason, first, that the injunction was not the whole object of the bill, and second, the other prayers to vacate the award and for the amounts were clearly proper. It is equally true, that in his decree, he assigns no reason or ground for the dismissal, and it may be claimed that whilst he found no authority for awarding the injunction, he, at the same time, found all the other questions presented by the bill against the plaintiff, and therefore dismissed the bill. It cannot be denied, but that if satisfied that the injunction should be denied, the circuit court should have decided upon the validity of the award ; and if that were found to be invalid, should then have ordered the accounts asked for by the plaintiff. Under either aspect of the case, this court will now proceed to pronounce such

decree as should have been rendered by the circuit court, and remand the cause for further proceedings to be had in conformity thereto. Under the allegations of the bill, all the material and substantial parts of which have been, as we respectfully submit, fully sustained by the evidence, the plaintiff had clearly sustained wrong; its rights had been violated and usurped by the City, in the most flagrant manner, with a presumption and wantonness that would be ludicrous, were not the consequences so gravely injurious, not merely to the rights and interests of this particular plaintiff, but to all our long settled and well established principles and maxims, governing the rights of property, whether corporate or individual.

Was the award a valid one, under the 17th section of the charter of the company? and if valid, were the authorities of the city justifiable in taking possession of the property and franchises with the strong hand? Was the title cast upon the city by operation of law, upon the rendition of the award mentioned in the 17th section? Does not the act require the deed or other proper instrument in writing of the company conveying their property and franchises to the City, as a condition precedent? Does this *coup d'etat* of the authorities of the City justify the claim, that they are in such peaceable and quiet possession as to deny to the company any right to contest the validity of their proceedings?

The decision of these and other pertinent questions is paramount to that other question touching the jurisdiction of the circuit court to award the writ of injunction. If this court decide, as we confidently claim must be the result, that the award is invalid and void, it is, at least in the opinion of the counsel preparing this brief, perfectly immaterial whether an injunction is awarded or not. The decree of which we complain must be reversed and an account ordered. This settles the case as justice and right require it should be settled. The fourth section of the Ch. on Awards, (Code of West Virginia, p. 569,) whilst limiting the power of the courts of law, in setting aside an award, expressly provides: " But this section shall not be construed to take away the power of courts of equity over awards." This power and jurisdiction of courts of equity are so well settled that nothing need be here

said in their vindication. In this case the city has not adopted such course of proceeding as would submit the question of the validity of the award to a judicial examination and decision. In an award between individuals, whether made for payment of money or doing or not doing anything ; whether the submission be under rule of court or not; whether suit be pending or not; no one ever before claimed that the award executed itself against the consent of either party; or that a judgment or decree of a court of competent jurisdiction, was not essential to its full, fair and just enforcement. We insist that, against the consent of this plaintiff, the city could only avail itself of the right to purchase the property and franchises of the company under the seventeenth section, by bill in equity to enforce the award, and requiring the company to account, &c.

But having adopted the *role* of the highwayman ; acting upon the assumption that might makes right; treating it as what was some years since called a case of *military necessity ;* the plaintiff was compelled to file this bill, alleging that the award was void, should be vacated for the reasons and causes assigned, and praying the accounts, &c. The plaintiff had availed itself of the statutory remedy, to recover *possession* of its lots and the works thereon erected; but by common consent the trial has been delayed, until the court of equity shall decide upon the validity of that pretended award, and the proceedings of the authorities of the city of Wheeling under it.

The question of the jurisdiction of the circuit court, to award the injunction, which was refused in this case, has been already so fully discussed in a printed argument on behalf of plaintiff, that it is not deemed necessary to discuss it further in this brief; especially as we deem it a subordinate one. We look upon the injunction, as auxiliary to the other relief sought by the bill. We cannot refrain, however, from the suggestion, that the writ of *quo warranto*, being a proceeding of a quasi criminal character, is not such a relief as would redress the wrongs of which this plaintiff reasonably complains, and is not deemed a sufficient reason why this bill should have been dismissed. *VanCortland* vs. *Underhill*, 2

Johns. Ch. 360; *Ludlows* vs. *Simond*, 2d Cases in Error, N. Y., (cited as Caines' Cases,) 40-56.

The remedy does not reach the wrong. The judgment would be no redress to the plaintiff, even if all it alleges and claims in the bill should be conceded. This is equally true of the injunction, except as auxiliary to the relief and redress which the plaintiff prays: an account, if the court be first satisfied and so decree, that the award is a nullity.

In the case of the *Commonwealth* vs. *the James River Company*, 2 Virginia Cases 109, it was determined that the failure of an incorporated company to do its corporate duty, is an injury, and that an information in the nature of a *quo warranto*, is the proper remedy by which to try and decide, whether the charter of the company ought to be nullified and vacated, or to prevent the company from receiving tolls.

So also, as the style of the writ implies, when a corporation, whether private or municipal, undertakes the exercise of a franchise not conferred, or prevents a franchise granted to the prejudice of the public interests and policy, the same remedy, by information in the nature of such writ, would doubtless appty. We also refer to Angell & Ames on Corporations, sections 733-734-736 and 764.

In the case of *Com.* vs. *The Union Insurance Company in Newburyport*, 5th Mass., 230 Ch., J. Parsons says: "Informations of this sort are properly grantable for the purpose of inquiring into the election or admission of an officer or member of a corporation, when moved for by any person interested in, or injured by such election or admission, if the same was unduly made. * * * * We are well satisfied that a corporation, as well when created by charter under the seal of the Commonwealth as by statute by the Legislature, may by malfeasance or non-feasance forfeit its franchises, and that by judgment on an information, the Commonwealth may seize them. * * * * An information for the purpose of dissolving the corporation, or of seizing its franchises, cannot be prosecuted but by the authority of the Commonwealth, to be exercised by the Legislature, or by the Attorney or Solicitor General acting under its direction, or *ex officio* in its behalf."

In the case of *the People* vs. *The Utica Ins. Co.* [15 Johns. 358 at p. 387.] Spencer J., after defining a franchise, says, "an

information,in the nature of a writ of *quo warranto*, is a sub-
stitute for that ancient writ, which has fallen into disuse;
and the information which has superseded the old writ, is de-
fined to be a criminal method of prosecution, as well to pun-
ish the usurper, by a fine for the usurpation of the franchise,
as to oust him, and to seize it for the crown.    It has for a long
time been applied to the mere purpose of trying the civil
right, seizing the franchise, or ousting the wrongful possessor,
the fine being nominal." On p. 389 he says: "Many cases
might be cited, in which information in the nature of a writ
of *quo warranto*, have been refused, where the right exercised
was one of a private nature, to the injury only of some indi-
vidual." We cannot refrain from quoting other sentences
from this opinion bearing upon another point in this brief.
The eminent jurist says: "I know of no other rule by which
to construe a statute, than to examine it by the words it con-
tains, to give to its expression a fair and just interpretation,
upon the established rules of construction.    Courts of law
cannot consider the motives which may have influenced the
Legislature, or their intentions, any further than they are
manifested by the statute itself." See p. 394.    In the case of
*the People* vs. *Sweeting*, 2d Johns. N. Y. 184, it was held—"This
court has a discretion to grant motions of this kind," that is
motions for leave to file an information in the ' nature of a
writ of *quo warranto*, "or to refuse them, if no sufficient rea-
sons appear for allowing this mode of proceeding."

At this stage of the brief, we have been furnished by our
associate counsel (Messrs. Lamb & Paull) with their own brief
in reply to the arguments of defendants' counsel.    This we
append as a supplement to our own, and as it is so exhaustive
and conclusive upon this point in the case, we deem it unneces-
sary to pursue its discussion.    It will be remembered, that in
the argument before the circuit judge, this idea that an infor-
mation in the nature of a writ of *quo warranto*, was not sug-
gested by either of the counsel for the city; as it most as-
suredly had never occurred to, or been suggested by, the coun-
sel of the plaintiff.    After that argument was closed, and the
case had been submitted to the circuit judge, the late B. Stan-
ton, Esq., the leading counsel for the City, prepared a written
brief, and handed it to the judge.    In that brief, he, for the

first time broached the idea, and supported it by the authorities since relied upon. The argument with the authorities came to our knowledge, for the first time in the argument before your honors. We mention these facts, to explain the omission of the reply to this suggestion, of the information in the nature of a *quo warranto*, in the opening argument printed by Messrs. Lamb & Paull.

Upon this point I have now but to add, that as an answer to the bill of this plaintiff, this suggestion that the remedy of the plaintiff, should have been an information in the nature of a writ of *quo warranto* instead of the injunction prayed for is unreasonable. The plaintiff asks for *bread* and they offer it a *stone.*

That the pretended award is invalid and void, has been sufficiently argued, and upon this great leading question in the case we have but little to add.

The 3d clause of the 17th section of chapter 16 [at page 104] of the Code of Virginia of 1849, which took effect July 1st, 1850, does not apply. It is in the following words: "Words purporting to give authority, to three or more public officers or other persons shall be construed as giving such authority to a majority of such officers or other persons, unless it shall be otherwise expressly declared in the law giving the authority."

This law did not take effect by its own provision, [Ch. 216 Code of 1849, p. 800,] until the 1st of July, 1850. Upon this point we refer to *Potters' Dwarris on Stat. and Com.*, p. 162 n. 9.

But we insist that this rule of construction, does not apply to the submission provided for in section seventeen of the act under consideration: 1st. Because that section is express in its terms—" to be fixed, ascertained and determined * * * by the award in writing of *three persons*," and therefore comes within the saving clause—" unless it shall be otherwise expressly declared in the law giving the authority;" and 2d and chiefly because it is not intended to apply to private arbitrations, whether the submission be by private statute, agreement of parties, or in any manner otherwise.

Upon the 1st of these reasons, we have only to say, that looking to the whole act incorporating the plaintiff, the relation between it and the city of Wheeling, and all the sur-

62

rounding circumstances, we think abundant reason may be found for what we deem the express declaration in the act, that the award shall be made by the whole three arbitrators.

And just here, we must pause to notice the direct and indirect aspersions made by counsel of defendants, upon the fairness and impartiality of Mr. B. M. Eoff, the arbitrator named by the plaintiff. In this community where he has been extensively known since his birth, his early youth and manhood, he needs no vindication. In the record nothing appears to justify these aspersions, and in making them so wantonly, counsel could only refer to the facts, that he was a stockholder by purchase at a large premium, and dissented from the award made by Woods and McLure. The deposition of Mr. Eoff is in the record; and we earnestly ask, that it, both in chief and on cross-examination, may be most carefully and rigidly examined, and compared with the other testimony in the cause—and especially with the deposition of Mr. McLure. We know that such an examination and comparison, must, in the opinion of your honors, establish not only Mr. Eoff's well-known personal fairness, impartiality and integrity, but also his clear and intelligent perception of his duties and responsibilities as an arbitrator. In answering the objections that have been urged so forcibly, by our associate counsel, to the conduct of Mr. McLure as an arbitrator, and his consequent unfitness—objections clearly and convincingly arising upon Mr. McLure's own testimony, as well as the testimony of others; the learned and astute counsel of the City, as a sort of equitable set off, most amusingly absurd, have sought to show Mr. Eoff's unfitness, as if an award rendered void and invalid by the unfitness, improper conduct, and partiality of Mr. McLure could be rendered valid and binding by impeaching the fitness, conduct and impartiality, of Mr. Eoff! But enough of this digression.

The clause under discussion was intended as a rule for the construction of public statutes. In their foot note to this clause, in their report, [Vol. 1, p. 71,] the revisors who reported the Code of 1849, say: "in consequence of this clause, the words, '*or a majority of them,*' in many cases in which they occurred in the Code of 1819, will be found omitted in these statutes." The clause evidently refers to public officers or

other persons exercising or discharging some public duty or function, either state or municipal, and not to an arbitrator. We refer to *Patterson* vs. *Leavitt* 4 *Conn.* 50–52–53 ; *Jeffersonville R. R. Co.* v. *Mounts*, 7 *Ia.* 669; *Grindley* v. *Barker*, 1 *Bos. & Pull*, 236 ; *Greene* v. *Miller*, 6*th Johns*, 39 ; *Franklin* v. *Osgood*, 14*th Johns*, 560 ; *Ex parte Rogers*, 7 *Cowen* 56, in connection with the cases cited by counsel for the City.

*Phippen* v. *Stickney*, 3 *Mer.* 34, and *Hobson* v. *McArthur*, 16*th Peters*, 182.

We do not understand why the former case was cited by defendants; the court say : " The only remaining objection is, that the plaintiff is not entitled to recover, because there has been no valid award made, by the three persons agreed upon by the parties, fixing the sum to be paid by the plaintiffs, to entitle him to a conveyance from the defendant. The objection is, that of the three arbitrators selected by the parties, two only concurred in the award. This would constitute a valid objection to an action on an award founded on a submission at common law, there being no stipulation that a majority should decide. The question arises here, however, under different circumstances ; the plaintiff founding his cause of action on the promise of the defendant to convey to him the land." Nor can we perceive the reason for citing the case of *Hobson* v. *McArthur* ; for in this case, the court held that the submission itself provided for an award by two of the arbitrators. The case of *Carpenter* v. *Wood*, 1 *Met.* 409, is an equally unfortunate citation by defendant's counsel. A submission was made to the arbitration of three persons, with an agreement that their award, *or the award of a majority of them*, should be final. All the arbitrators met and heard the parties, but after consulting together at different times, and not agreeing on an award, one of them told the others that he should not sit with them again. The two others afterwards met and made an award, without requesting the attendance of the third or giving him notice. It was held by the court that the award was valid.

So also the case in 51 *Pa. State Reports: Reynolds* v. *Caldwell* is directly opposed to the ruling of the Supreme Court of Appeals of Virginia, in the case of *Polly, Woods & Co.*, and *The*

*Baltimore and Ohio R. R. Co.,* 14 *Grat.* 447–463; if either case were at all pertinent to the points discussed in this case.

*Allison & Jeffers* for the appellees.

MAXWELL, J.   The question as to whether the Gas Company might proceed to obtain relief by *quo warranto,* or information in nature of a *quo warranto,* made by counsel for the City, does not arise in this case.

This is a proceeding or bill in equity, and as to jurisdiction the only question for this court to determine is, whether or not, in the pleadings and proofs, a proper case is made for relief in a court of equity.

The first point made by the counsel for the Gas Company is, that the case on the pleadings and proofs, is a proper one for relief in equity.

There was a demurrer filed by the City to the bill, for the alleged reason that there is no equity therein.   This demurrer is in the answer of the City, but was never acted on by the court.

When the case was decided it was heard in the bill and papers filed as exhibits, answers of defendants, replications filed, agreements and depositions taken in the cause.

The fourth section of chapter 108 of the Code, p. 559, provides that no award made under the provisions of said chapter shall be set aside, except for errors apparent on its face, unless it appear to have been procured by corruption, mistake, or other undue means, or that there was partiality or misbehavior in the arbitrators, or any of them.   But the section shall not be construed to take away the power of courts of equity over awards.

This chapter does not apply to awards, unless they are made under its provisions, and it is expressly provided that although made under its provisions the power of courts of equity over them shall not be taken away.

Courts of equity have always had and exercised jurisdiction to interfere to set aside awards for fraud, accident, partiality, misconduct or mistake of the arbitrators.

2 *Story's Eq. Ju.,* § 1451–1452.

The bill in this case does not charge any fraud, accident or mistake.

There is an effort in the bill to charge McLure, one of the arbitrators, with partiality and misconduct.

The bill, after stating that the city of Wheeling appointed John McLure as one of the arbitrators, charges : "Before appointing John McLure as such arbitrator, the Council of the city of Wheeling knew that he had openly declared that, in his opinion, the property of the plaintiff, exclusive of the franchises of the charter, and the dividends and profits accruing to the stockholders, was not worth exceeding the sum of fifty thousand dollars."

Then, after making some statements in reference to the making of the award and denying its efficiency when made, the bill proceeds : "And the said plaintiff further insists that the said John McLure, by reason of his having formed and expressed the deliberate opinion before mentioned, as to the value of the property of the company, before his appointment as such arbitrator, was utterly incompetent as an arbitrator, and any award signed by him was utterly null and void." * *

" The plaintiff alleges and charges to be true that throughout the investigation and deliberations of the arbitrators, the said John McLure acted as the adviser and partizan of the city of Wheeling, in the procurement of testimony, the examination and cross-examination of witnesses, the expresson of his opinion as to the value of different portions of the property of the plaintiff, and the declaration of his unwillingness to hear or believe the opinions and judgments of the plaintiff's witnesses as to the cash value of its property, before said witnesses were sworn or examined, for the reason that the witnesses were stockholders and directors of the company."

In respect to the averment that McLure, before his appointment as arbitrator, had expressed his opinion as to the value of the property, and that the Council of the city of Wheeling knew it, nothing need be said, because it is admitted that there is no evidence in the record to show that if any such opinion had been expressed by him, the city Council, or any member of it, knew anything of it.

*Morse on Arbitration and Award,* 535 ; *Conrad* vs. *Massasoit Ins. Co.,* 4 Allen, 20.

The charge that "throughout the investigation and delibera-

tions of the arbitrators, the said John McLure acted as the adviser and partisan of the city of Wheeling, in the procurement of testimony," &c., is more serious.

Like jurors empanelled for the trial of a cause, or judges on the bench, arbitrators are invested, as to the case submitted to them, with judicial functions, the rightful discharge of which calls for, and presupposes the most absolute impartiality. And a judge, juror or arbitrator, should not only possess the quality of impartiality in fact, and have the conscience of it in the given case; he should moreover sedulously shun all the possibilities even of insensible bias. And though therefore, arbitrators be nominated, one by each party, still they are not to consider themselves as representing separate parties, and the advocates of opposite sides, but as called in to execute a joint trust, and to look impartially at the true merits of the matter submitted to their judgment. Under no circustances can an arbitrator become an advocate. He is always bound to exercise the highest degree of judicial impartiality, without the slightest regard to the manner in which the charge has been placed upon him.

*Morse on Arbitration and Award,* p. 106, 107 ; *Russell on Arbitration,* p. 205 ; *Strong* vs. *Strong,* 9 Cushing 560.

An arbitrator must not act as the agent of the party appointing him.

*Morse on Arbitration and Award,* p. 107.

*Featherstone* vs. *Cooper,* 9 Ves. 67.

*Colcraft* vs. *Roebuck,* 1 Ves. Jr. 226.

If the bill had charged that McLure acted as the agent of the City during the arbitration, the charge would be sufficient on the face of the bill to give the court jurisdiction.

But the charge is that he acted as the " adviser and partisan of the city of Wheeling," and this would seem to be a more serious charge than it would be to charge that he acted as agent.

This is therefore a sufficient charge of partiality and misconduct, to give a court of equity jurisdiction of the case to set aside the award, if the charge is true.

The answers deny this allegation of the bill, and its truth must depend on the proofs in the case.

There is no evidence to show that during the arbitration, McLure acted as the adviser of the city of Wheeling.

Mr. McLure, in his testimony says: that he, "on the part of the City, went on, through the sanction of Mr. Woods, and by an agreement of one of our rules, got all the facts that it was possible to get at home and abroad, and had them presented before us, from which, and in connection with our own knowledge, we made up our award."

Mr. Eoff, in his testimony, in answer to the question, "during the progress of the arbitration, who attended mainly to the interests of the City, in collecting up and arranging testimony, procuring the attendance of witnesses, and examining and cross-examining them"? said "Mr. John McLure, with the occasional assistance of Mr. Jeffers, but Mr. McLure principally, notwithstanding my repeated remonstrance that he was going beyond the line of his duty in thus acting, making himself thereby a partisan rather than an arbitrator, juror or judge, and protesting that I would not act in the same manner."

O'Brien in his testimony states, that McLure applied to him to become his assistant to "get up evidence in behalf of the City, help him arrange it," &c., which O'Brien says he refused to do.

The evidence therefore, shows very clearly, that McLure misconceived his duty as an arbitrator, and acted in behalf of the City in getting up evidence to be used before the arbitrators.

There is nothing in the evidence to show partiality or corruption, or improper motives in the arbitrator, McLure.

It is not alone the fact, but the aspect of perfect fairness, which must be preserved, and an arbitrator cannot be too careful as to his conduct, holding this end in view. It is not his own consciousness of rigid justice that supports his determination of the controversy. It is not his conscientious intent to be honest, nor his conviction in his own mind that he is so, that can suffice. It is his external actions that will be subjected to scrutiny; and if these do not satisfactorily bear the test, the award will fall.

*Morse on Arbitration and Award,* p. 534; *Strong* vs. *Strong,* 9 Cushing 560.

There may be ample misconduct in a legal sense to make the court set aside an award, even where there is no ground for imputing the slightest improper motives to the arbitrators.

*Morse on Arbitration and Award*, p. 534.

If the case stood alone on the evidence of the legal misconduct of McLure, the award would have to be set aside.

*Walker* vs. *Frobisher*, 6 Ves. 70.

But upon looking into the record to see what the evidence is in respect to the alleged misconduct of McLure, it appears that Eoff, the arbitrator appointed by the Gas Company, is a stockholder in the said company and interested in the result of the arbitration. And that he was appointed arbitrator because he was a stockholder and because it was understood that McLure was to be appointed by the City. Though it does not directly appear, yet it is plainly inferable from the testimony in the record that Eoff was appointed by the Gas Company to watch McLure.

In the case of *Fox* vs. *Hazelton*, 10 Pickering, 277, it is said by the court that if parties really intend to have their rights decided by impartial judges they are entitled to insist that all shall be impartial. But if they are content to submit questions in controversy to those who are known to have formed and expressed opinions upon the subject matter, or who are known to have partialities and prejudices for or against the respective parties, an award made by such arbitrators is binding. And it is not unfrequent in practice for each party to select a friend known to have formed and expressed opinions upon the subject, and preferences for the parties respectively trusting that these opposite prejudices will balance each other, especially with the aid of an impartial umpire. Without commending the expediency of such references, the court can entertain no doubt of the validity of an award made by such referees, nor could the parties be heard to impeach the award in this case under the circumstances of the appointment and conduct of the arbitrators.

Especially should this be so, when, so far as the record discloses, the amount of the award seems to be fair.

The case was not made up with a view to show the value of the property of the Gas Company, but there is some evi-

dence in the record as to the value of some items embraced in the award and in every instance in which I have compared the value fixed in the award with the evidence, the value fixed is found to be fully as high as is warranted by the evidence.

Upon the whole case, therefore, the award ought not to be disturbed.

There is no other ground of equity jurisdiction set up in the bill, unless the court should be of opinion to set the award aside, but as this court fails to see any good cause to set the award aside, the other questions cannot be considered.

The question as to the sufficiency or insufficiency of the award on account of but two of the arbitrators signing it, cannot be determined by this court for want of jurisdiction.

The decree complained of will have to be affirmed with damages and costs.

The other judges concurred.

DECREE AFFIRMED.